# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## BOWLING GREEN DIVISION

CIVIL ACTION NO. 1:08CV-94-JHM

FREDERICK P. CLAYTON, JR., et al.                    PLAINTIFFS

V.

HEARTLAND RESOURCES, INC., et al.                    DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on several motions by Defendant Hunter Durham. Durham has filed a motion for summary judgment against all Plaintiffs based on an election of remedies theory [DN 258] as well as a motion for oral argument [DN 245]. Durham has also filed eight motions for summary judgment against individual Plaintiffs on several overlapping theories. The eight individual motions are against the following parties: George Wolff and GDWP LLC [DN 240]; Peter and Nancy Keim [DN 243]; William R. Siefring Trust [DN 244]; B.L. Lanier & Associates, B.L. Lanier Fruit Company, Sara T. Lanier Irrevocable Trust and Bobby Lanier [DN 247]; Thomas G. Marks Living Trust Date January 13, 1986 [DN 248]; Ken and Anita Brown [DN 249]; Dan and Martha Boyd and Able Fence Company Profit Sharing Plan [DN 252]; Cassidy Hurst and Millennium Realty LLC [DN 253]. Having been fully briefed, these matters are ripe for decision.

## I. STANDARD OF REVIEW

In order to grant a motion for summary judgment, the Court must find that the pleadings, together with the depositions, interrogatories and affidavits, establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ.

P. 56.  The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record which demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to do more than simply show there is some "metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The Rule requires the non-moving party to present "specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  Anderson, 477 U.S. at 252.  It is against this standard that the Court reviews the following facts.

## II. BACKGROUND

Heartland Resources, Inc. (Heartland) is a Kentucky corporation that was formed in 2002 by David Stewart and Mark Haynes.  Heartland is an oil and gas exploration company that issued Working Interests and partnership interests in a number of offerings sold to the Plaintiffs.  Hunter Durham is an experienced securities lawyer of forty-four years, who represented and advised Heartland Resources in the issuance of these securities.  Durham's services for Heartland included drafting and reviewing private placement memorandums (PPMs) as well as making himself available to speak with prospective investors, should they have any questions. In this role, Durham drafted

and/or reviewed approximately twenty PPMs over a five year period and spoke to at least two investors on the telephone.

Many of the Plaintiffs received these PPMs, although not all investors received a PPM, after being solicited by Heartland. Heartland engaged in a general solicitation process which involved salesmen placing hundreds of unsolicited calls each day. Heartland salesmen also attended at least two investor conferences in search of potential investors. These salesmen were paid a modest salary but were able to receive bonuses based on a profit-sharing plan that compensated the salesmen for revenue generated from the sale of securities to investors. To qualify for the plan, a salesman had to reach certain bench marks that included the number of calls placed, the number of PPMs sent to investors, the number of new clients retained, and the amount of money raised for general or limited partnership activities.

Heartland itself was not a registered securities broker-dealer in the state of Kentucky, which was a violation of Kentucky securities law, and a fact known to Durham. The securities that Heartland was issuing were not registered with the Securities and Exchange Commission or the Kentucky Division of Securities, another fact known by Durham. The consequence of the general solicitation process, the salesmen's remuneration, and the violation of Kentucky securities law was that the securities themselves were neither registered nor eligible for an exemption under either federal or Kentucky law. Therefore, each investor had a right to rescission of his or her investment in Heartland and its issuer partnerships. The PPMs, however, never revealed that the interests being sold were not exempt and were subject to a claim of rescission. In fact, the PPMs specifically stated that the securities being sold *were* exempted under federal and Kentucky law.

This misrepresentation along with five other misrepresentations and omissions found or not found in the PPMs comprise the basis for the present suit against Durham.[1] Specifically, Plaintiffs allege that the PPMs: 1) failed to disclose that in 1998 David Stewart and Mark Haynes, as well as every entity directly and indirectly controlled by them, were prohibited from selling unregistered securities in the state of Wisconsin; 2) misrepresented that in December 2002 an administrative action was filed against Homeland Energy of Kentucky, Inc. (Homeland Energy) by the Kentucky Division of Securities charging fraud and misrepresentation;[2] 3) misrepresented that a 2006 cease and desist order issued by the Alabama Securities Division was "temporary"; 4) failed to disclose that in 2006 David Stewart was indicted and pled guilty to federal income tax evasion;[3] 5) misrepresented that the personal assets of investors would not be subject to claims of creditors of the Issuing Partnership that were formed as general partnerships; and 6) that the securities were exempt from registration under both federal and Kentucky securities laws.

_____

[1]  In their briefs, Plaintiffs allege that there are eight material misrepresentations or omissions found or not found in the PPMs. However, the Court finds that the omissions regarding the type of solicitation Heartland used to acquire investors, that Heartland salesmen were paid remuneration, that Heartland was not a registered broker-dealer, and consequently that investors would have a right to rescission of their investments are actually a product of the misrepresentation that the securities were exempt under federal and state law. Therefore, the Court will address these omissions as a single misrepresentation found in the PPMs that the securities were exempt under federal and state law.

[2]  David Stewart was the owner and chief executive officer of Homeland Energy and Mark Haynes was the company's executive vice-president at the time charges of fraud and misrepresentation were alleged to have occurred.

[3]  This omission could also be characterized as a misrepresentation. After Stewart's conviction, the PPMs stated that David Stewart had stepped down as CEO of Heartland for personal reasons. In their own cross motion for summary judgment, Plaintiffs argue that the PPMs "prepared and reviewed by Mr. Durham . . . contained a material misrepresentation regarding why David Stewart was no longer CEO of Heartland Resources." (Pls. Mot. Partial Summ. J. 17.)

-4-

In February, 2008, counsel for Plaintiffs sent a letter to Durham, as attorney for Heartland, seeking monies paid to Heartland for the completion of twenty-four (24) wells in Knox County, Kentucky, which were never completed or equipped by Heartland. This lawsuit followed. On February 1, 2010, this Court granted the Plaintiffs' motion for partial summary judgment against Heartland and all other defendants, except Durham, on eight counts and found that the Plaintiffs were entitled to rescission of their contracts with Heartland.

### III. Discussion

Durham has moved for summary judgment against all Plaintiffs based on an election of remedies theory. Durham has also moved for summary judgment against individual Plaintiffs on several different theories found in eight separate motions. The arguments and defenses advanced in support and opposition to the eight individual motions for summary judgment were in many respects identical. These individual Plaintiffs are all represented by the same attorneys, and although the motions were filed against separate parties, they were all filed at the same time, read, and responded to by the same attorneys. Therefore, all of the Plaintiffs named in the eight separate motions for summary judgment were on notice of the arguments made and had an opportunity to respond to each argument. Due to the nature of the filings and in the interest of judicial economy, the Court sees no reason why its analysis of the arguments raised by Durham in the individual motions should not apply to all of the Plaintiffs named in those eight motions.

### A. Election of Remedies

Durham's motion for summary judgment against all Plaintiffs is based on one substantive theory; the election of remedies. Durham contends that because Plaintiffs chose to pursue and were granted the remedy of rescission against all other Defendants, they are now precluded from seeking

actual damages against Durham.  Durham argues that rescission is not an appropriate remedy against

him because he was a non-party to the agreements and is not in privity with Plaintiffs.  He states that

"[b]ecause the plaintiffs have no claim for rescission against Mr. Durham, and because they no

longer have a claim for out-of-pocket damages (having made a final election to pursue rescission),

the plaintiffs have no viable damage claim against Mr. Durham [and] all claims against him should

be dismissed."  (Durham Reply Mot. Summ. J. Against All Pls. 6.)  Plaintiffs argue that they are

seeking and are entitled to rescission against Durham and that this is not an inconsistent remedy.

The Court will first address whether rescission is an appropriate remedy, and then whether the

election of remedies doctrine bars Plaintiffs from pursuing actual damages against Durham.

### *i. Rescission*

A district court has broad discretion in determining the appropriate remedy for securities

fraud violations.  Rowe v. Marietta Corp., 172 F.3d 49 (6th Cir. 1999) (Table) (citing Arrington v.

Merrill Lynch, Pierce, Fenner & Smith Inc., 651 F.2d 615, 620-21 (9th Cir. 1981)).  "The correct

measure of damages in cases arising under § 10(b) [and] Rule 10b-5 is generally held to be an 'out

of pocket' measure."  Stone v. Kirk, 8 F.3d 1079, 1092 (6th Cir. 1993).  "In some circumstances,

plaintiffs in § 10(b) cases may opt for rescission in lieu of out-of-pocket damages."  Ashland v.

Oppenheimer & Co., Inc., 689 F. Supp. 2d 874, 881 (E.D. Ky. 2010) (citing Randall v. Loftsgaarden,

478 U.S. 647, 662 (1986)).  However, the problem with awarding rescissional damages is that it

> "permits the defrauded securities buyer to place upon the defendant the burden of
> any decline in the value of the securities between the date of purchase and the date
> of sale even though only a portion of that decline may have been proximately caused
> by the defendant's wrong . . . .  Under these circumstances, the rescissional measure
> is unjust insofar as it compensates an investor for the nonspecific risks which he
> assumes by entering the market.  Losses thus accruing have no relation to either the
> benefits derived by  the defendants from the fraud or to the blameworthiness of their
> conduct."

Matthews v. Kidder, Peabody & Co., Inc., 260 F.3d 239, 249-50 (3d Cir. 2001) (quoting Huddleston v. Herman & Maclean, 640 F.2d 534, 555 (5th Cir. 1981) *aff'd in part, rev'd in part on other grounds by* 459 U.S. 375 (1983)).

Rescission is often reserved for those parties that are in privity with one another. *In re* Letterman Brothers Energy Sec. Litig., 799 F.2d 967, 972 (5th Cir. 1986). However, in limited circumstances, courts have awarded rescission to plaintiffs not in privity with defendants. See e.g. Arthur Young & Co. v. Reves, 937 F.2d 1310, 1336 (8th Cir. 1991); Bruschi v. Brown, 876 F.2d 1526, 1532 (11th Cir. 1989); Gordon v. Burr, 506 F.2d 1080, 1085 (2d Cir. 1974). In doing so, those courts have recognized the harshness of such an award when "'the defendants were not the actual sellers of the stock and therefore must 'rescind' by paying an amount they in fact never received.'" Reves, 937 F.2d at 1336 (quoting Bruschi, 876 F.2d at 1532).

In the present case, Plaintiffs allege that over a five year span Durham prepared and/or reviewed twenty PPMs that contained numerous misrepresentations and omissions. Plaintiffs claim that they would not have invested in Heartland if not for those misrepresentations and omissions. Plaintiffs argue that this conduct rises to such a level that Durham should be responsible for the return of each Plaintiff's entire investment. This claim for a return to the status quo ante would be a harsh result indeed, given that Durham received nothing from the Plaintiffs in return for their investment in Heartland. Although rescission has been awarded under somewhat similar circumstances, such an award is the exception and not the rule. Given the broad discretion afforded the court, the Court finds that the nature of Durham's involvement in the present case does not warrant a rescissionary award. The evidence shows that he drafted and/or reviewed legal documents and had very little contact with any of the Plaintiffs. While Rescission can be an appropriate remedy

for violations of § 10(b) and Rule 10b-5, the proper measure of damages against Durham for any liability related to securities fraud should be limited to the out-of-pocket damage.

### ii. Election of Remedies

Having found that the proper measure of damages should be out-of-pocket damages, the Court will now address whether Plaintiffs are barred from pursuing such damages against Durham under the doctrine of election of remedies. The doctrine of election of remedies "'means that when a person has at his disposal two modes of redress, which are contradictory and inconsistent with each other, his deliberate and settled choice and pursuit of one will preclude his later choice and pursuit of the other.'" <u>McKissic v. Com. Transp. Cabinet</u>, 2010 WL 566675 (Ky. Ct. App. 2010) (quoting <u>Collings v. Scheen</u>, 415 S.W.2d 589, 591 (Ky.1967)). "The doctrine . . . is designed to mitigate possible unfairness to both parties" and "to prevent double recoveries or redress for a single wrong." 25 Am. Jur. 2d Election of Remedies § 3 (2010). It is only applicable where inconsistent remedies are asserted against the same party or persons in privity with such a party. 28A C.J.S. Election of Remedies § 13 (2010); <u>see also</u> <u>Genetti v. Caterpillar, Inc.</u>, 621 N.W.2d 529, 546 (Neb. 2001). "The doctrine is not a rule of substantive law but rather is a technical rule of procedure or judicial administration." <u>Combs v. U.S.</u>, 768 F. Supp. 584, 594 (E.D. Ky. 1991) (citing <u>NE Coal Co. v. Blevins</u>, 277 S.W.2d 45, 48 (Ky.1955)). "The rule is considered a 'harsh one' that 'should not be lightly enforced' nor 'unduly extended, and 'it must be strictly confined within its reason and spirit.'" <u>Id.</u> (citation omitted).

Durham claims that Plaintiffs have elected and been awarded the equitable remedy of rescission against all other Defendants. He argues that the election of remedy doctrine now bars Plaintiffs from recovering actual damages from him. In support of this argument Durham cites

several cases that stand for the general proposition that a plaintiff may not have a contract both enforced and rescinded at the same time. See Coal Res., Inc. v. Gulf & Western Indus., Inc., 756 F.2d 443, 446 (6th Cir. 1985); MCA Television, LTD v. Public Interest Corp., 171 F.3d 1265, 1275 (11th Cir. 1999); Medcom Holding Co. v. Baxter Travenol Lab., Inc., 984 F.2d 223, 229 (7th Cir. 1993).

These cases are distinguishable from the present suit. Each of the cases cited by Durham discusses the election of remedies in reference to a plaintiff pursuing multiple remedies against the same defendant or group of defendants. None of the cases cited stand for the proposition that the election of remedies bars a plaintiff from recovering rescission from one defendant and actual damages from another. Durham's cases are also distinguishable on the grounds that they are based on the prohibition of double recovery. In the present case, double recovery will only be an issue if Plaintiffs are able to recover their full judgment against Heartland. Because Heartland is currently in bankruptcy proceedings, it is unlikely that Plaintiffs will recover their full $18,000,000 judgment.

In Walvren v. Martin, 333 N.W.2d 569 (Mich. Ct. App. 1983), the Michigan Court of Appeals was faced with a plaintiff pursuing inconsistent remedies against multiple defendants. In discussing the election of remedies doctrine the court said

> We reiterate that, while plaintiff is entitled to complete relief, he is not entitled to double recovery. Hence, if verdicts are eventually returned against the sellers . . . for both rescission and damages, judgment may be entered on only one since these are alternative measures of plaintiff's loss. If judgment for damages is entered against the sellers, the other defendants may be held jointly and severally liable if a verdict is rendered against them. However, *if judgment for rescission is entered against the sellers, the other defendants may only be held liable to the extent that the rescission judgment has failed to restore the status quo (because of the sellers' insolvency or otherwise).*

Id. at 574 (emphasis added); see also Garrett v. Mazda Motors of America, 844 S.W.2d 178, 181 (Tenn. Ct. App. 1992) (affirming a damage award in a Lemon Law case that awarded plaintiff partial rescission against manufacturer as well as damages against dealer). A result in the present case, like the one anticipated in Walvren, is supported by the different policies and limitations associated with the election of remedies doctrine.

It is questionable whether the doctrine even applies to Plaintiffs' claims against Durham. The doctrine requires that the parties be in privity and as Durham has continuously pointed out, he is not in privity with Plaintiffs. Furthermore, allowing Plaintiffs to recover actual damages from Durham, in the wake of a judgment for rescission against all other Defendants, is unlikely to present an issue of double recovery. Such a ruling serves to mitigate unfairness while still allowing Plaintiffs to fully recover their losses. In light of the harshness of the election of remedies doctrine and the need to stay within its reason and spirit, the Court finds that the doctrine does not prohibit Plaintiffs from pursuing a suit for actual damages against Durham after having sought and received a judgment for rescission against all other Defendants. Therefore, Durham's motion for summary judgment on this theory is denied.

### B. § 10(b) and Rule 10b-5

Durham next moves for summary judgment on Plaintiffs § 10b and Rule 10b-5 claims based on Plaintiffs' inability to demonstrate loss causation. In a securities action, the plaintiff bears the burden of proving loss causation. 15 U.S.C. § 78u-4(b)(4). "Loss causation requires 'a causal connection between the material misrepresentation and the loss.'" Brown v. Earthboard Sports USA, Inc., 481 F.3d 901, 920 (6th Cir. 2007) (quoting Dura Pharm., Inc. v. Broudo, 544 U.S. 336,

342 (2005)).  "Traditional tests of proximate cause derived from tort principles are very much germane."  <u>Arthur Young & Co., v. Reves</u>, 937 F.2d 1310, 1332 (8th Cir. 1991).

The Court of Appeals for the Fifth Circuit has offered a concise statement of what is required to show that a misrepresentation or omission proximately caused an economic loss:

> The plaintiff must prove . . . that the untruth was in some reasonably direct, or proximate, way responsible for his loss. The [loss] causation requirement is satisfied in a Rule 10b-5 case only if the misrepresentation touches upon the reasons for the investment's decline in value.  If the investment decision is *induced by misstatements or omissions that are material* and that were relied on by the claimant, *but are not the proximate reason for his pecuniary loss, recovery under the Rule is not permitted.*

<u>Huddleston v. Herman & MacLean</u>, 640 F.2d 534, 549 (5th Cir. 1981), *aff'd in part and rev'd in part on other grounds*, 459 U.S. 375 (1983) (emphasis added).  <u>See also</u> <u>Berckeley Inv. Group, LTD v. Colkitt</u>, 455 F.3d 195, 222 (3d Cir. 2006) ("[T]he loss causation element requires the plaintiff to prove 'that it was the very facts about which the defendant lied which caused its injuries.'") (quoting <u>Caremark, Inc. v. Coram Healthcare Corp.</u>, 113 F.3d 645, 648 (7th Cir. 1997)).

In <u>Bastian v. Petren Res. Corp.</u>, 892 F.2d 680 (7th Cir. 1990), plaintiffs invested $600,000 in oil and gas limited partnerships.  However, the wells failed to produce enough oil to be commercially viable due to the unexpected drop in oil prices after 1981.  The plaintiffs claimed that they were fraudulently induced to invest based on material misrepresentations regarding the defendants' competency and integrity.  The <u>Bastian</u> plaintiffs claimed they did not know why their investments had failed, but that it did not matter because the defendants employed fraud to induce the investment.  They argued that had they known the truth, they would not have invested in the defendants' venture.  The Court of Appeals for the Seventh Circuit held that the plaintiffs failed to show loss causation.  The court noted that "[t]hey have alleged the cause of their entering into the

transaction in which they lost money but not the cause of the transaction's turning out to be a losing one." Id. at 684.

In the present case, Plaintiffs contend that the fraudulent misrepresentations induced them to invest in Heartland. They claim that the misrepresentations were so numerous and serious that the entire story of Heartland represented in the PPMs is a fiction. While these claims demonstrate "the cause of their entering into the transaction" they do not demonstrate the "cause of the transaction's turning out to be a losing one." Id. Responding to Durham's claim that loss causation is lacking, Plaintiffs argue, in rather illusory terms, that Durham caused their loss through his numerous misrepresentations. In their multiple responses to Durham's separate motions for summary judgment, Plaintiffs rely upon the same two arguments. Plaintiffs first argument that loss causation exists centers on the misrepresentation that the securities qualified for an exemption from registration. Plaintiffs argue that the securities were actually not exempt and were subject to rescission and that a successful claim for rescission would cause the business to fail due to liquidity problems with the result that the investors would lose their investments. Plaintiffs seem to contend, in their responses, that with this Court's granting of their motion for partial summary judgment against the Heartland Defendants that such a "possibility has now come to fruition, and [that] the Plaintiffs have obtained a judgment of approximately $18,000,000, an amount which likely exceeds the value of the assets of all of Heartland resources and the Issuer Partnerships." Plaintiffs appear to argue that by seeking and being granted rescission against Heartland, the Plaintiffs suffered a loss because the judgment caused Heartland to become too illiquid to operate.

As Durham noted in his Reply to Plaintiff Wolff's Response, the problem with this argument is that Plaintiffs cannot demonstrate that their successful claim for rescission caused Heartland to

become too illiquid to operate.  The record clearly reflects that in May 2009 Heartland Resources filed a petition for Chapter 11 Bankruptcy, and in November 2009, the Court appointed a receiver to manage the oil and gas wells that the Heartland Defendants had previously owned.  It was not until February 2010 that Plaintiffs were actually granted rescission against the Heartland Defendants.  It is clear that the Heartland Defendants' business was too illiquid to operate and was destroyed well before a successful claim for rescission was ever granted to Plaintiffs.  To claim that such a grant of rescission caused their loss is not supported by the record whatsoever.

Because Durham's argument was raised in a reply, the Court requested a sur-reply from Plaintiffs addressing this single argument and having received and reviewed that sur-reply the Court is even more convinced that Plaintiffs' claims lack loss causation.  In their sur-reply, Plaintiffs state that they are not claiming that the summary judgment against Heartland caused their loss, rather they claim that they suffered economic loss "caused by Mr. Durham's failure to disclose, long before summary judgment was granted against the Heartland Defendants."  Plaintiffs claim that the inclusion of their argument analyzing rescission and bankruptcy in all eight of their responses is "merely illustrative of the repercussions" of Durham's activities and that the "judgment . . . was simply one of the last tolls of the death knell for the Heartland Defendants."  Plaintiffs claim, over and again, that Durham's activities and not the summary judgment caused their loss.  Plaintiffs' repeated rhetoric will not change the fact that they have failed to produce evidence on which a jury could reasonably find that rescission caused them to suffer a loss.  Rather than claim that Durham caused their loss, Plaintiffs needed to produce evidence that an investor, any investor, was granted

rescission which either caused Heartland to file for bankruptcy or contributed to its bankruptcy. Plaintiffs have failed to do that. [4]

Plaintiffs do not and cannot point to any of the other misrepresentations or omissions as having caused the loss of their investments. Plaintiffs have produced no evidence that the misrepresentations regarding David Stewart's indictment for tax evasion, the Wisconsin prohibition, the Kentucky Securities Division fraud allegation, the temporary Alabama order, or the misstatement regarding General Partner liability caused Plaintiffs' loss of their investment.[5] All of these misrepresentations may have caused Plaintiffs to invest when they ordinarily would not have, but loss causation requires more than that. Plaintiffs must show that these misrepresentations caused the investment to be a losing one and Plaintiffs have failed to do so.[6]

---

[4]  In an attempt to illustrate loss causation, Plaintiffs argue that the investors' rights to rescission required Heartland to maintain capital reserves in the event rescission was granted. They claim that Heartland was undercapitalized because these reserves were never established. Plaintiffs still needed to produce evidence that rescission by an investor occurred and that the reserves were not adequate and, therefore, the business was forced to declare bankruptcy. Plaintiffs have not met this burden.

[5]  Plaintiffs' argue that their judgment against Heartland makes them creditors of the non-plaintiff investors who invested in Heartland General Partnerships, which illustrates loss causation. Becoming a creditor of a non-party does not demonstrate suffering an economic loss. In the event that the Plaintiff-creditors attack the assets of the non-plaintiff investors, the Plaintiff-creditors would be experiencing a gain and not a loss. While this would cause the non-plaintiffs to suffer a loss, it does not demonstrate Plaintiffs suffering a loss.

[6]  Durham also advances the argument that it was the failure of the wells to be commercially viable that caused the Plaintiffs' investments to fail and not any of the alleged misrepresentations or omissions. This argument also has the potential to prove that loss causation is absent. However, Durham only produces Plaintiffs' testimony, none of whom are experts in the field of oil and gas exploration, regarding the wells failure to produce oil or gas in commercially viable amounts. There is still a genuine issue of material fact as to whether the wells were commercial failures. But if the wells were deemed to have been commercial failures, the Court believes that Plaintiffs who invested in those wells would be unable to prove loss causation. See Bastian v. Petren Res. Corp., 892 F.2d 680 (7th Cir. 1990).

Plaintiffs have not shown that their successful claim of rescission caused Heartland Resources to fail such that their investment was lost. Nor have Plaintiffs produced evidence that any other misrepresentation caused Heartland Resources to fail. Finding no genuine issue of material fact as to the absence of loss causation, Durham's motion for summary judgment on Plaintiffs' §10(b) and Rule 10b-5(b) claim is granted.

Plaintiffs' claim that Durham did not argue for summary judgment on the Rule 10b-5(a) and (c) claims, therefore, summary judgment on these claims is not appropriate. However, in each motion for summary judgment Durham moves for judgment as to all of Plaintiffs' claims. In the individual briefs, Durham does not make separate arguments for Rule 10b-5(b) claims and for Rule 10b-5(a) and (c) claims. Durham instead makes his arguments under a single heading labeled Rule 10b-5 and as such the analysis found under those headings is meant to dispose of all claims based on Rule 10b-5. In support of this approach, Durham directs the Court to the section of a brief he had already filed that discussed the overlapping elements of Rule 10b-5(b) claims and Rule 10b-5(a) and (c) claims. (Durham Reply in Supp. of Mot. for Summ. J. against Ken and Anita Brown 6 n.5.)

Durham contends that the lack of loss causation results in all of Plaintiffs' Rule 10b-5 claims failing. Plaintiffs argue that, under <u>Affiliated Ute</u>, loss causation is not an element of Rule 10b-5(a) or (c) and that a lack of loss causation has no affect on those claims. Plaintiffs reliance on <u>Affiliated Ute</u> for this proposition is misplaced. <u>Affiliated Ute</u> states that claims under Rule 10b-5(a) and (c) do not require an alleged misstatement or omission. <u>Affiliated Ute Citizens of Utah v. United States</u>, 406 U.S. 128, 153 (1972). <u>Affiliated Ute</u> does state that "[u]nder the circumstances of this case, involving primarily a failure to disclose" that proof of reliance is not required to prove a 10b-5 violation and that the obligation to disclose and the withholding of material facts establishes

causation in fact.  Affiliated Ute, 406 U.S. at 153-54.  However, this distinction is not based on

whether the claim is 10b-5(b) or 10b5(a) and (c).  Rather, the presumption of reliance and causation

in fact are derived from the fact the case was a failure to disclose.  The present case is not a failure

to disclose, but is primarily a case of affirmative misrepresentations, and the presumptions cited in

Affiliated Ute do not apply.  While an alleged misstatement or omission is not a required element

for a successful 10b-5(a) or (c) claim, the other elements of a Rule 10b-5 claim must still be shown.

In re Merrill Lynch Investment Mgmt. Funds Secs. Litig., 434 F. Supp. 2d 233, 237 (S.D.N.Y.

2006).

Accordingly, Plaintiffs 10b-5(a) and (c) claims fail for the same reason that their 10b-5(b)

claim failed; a lack of loss causation.  Finding no genuine issue of material fact as to the Rule 10b-

5(a) and (c) claims, Durham's motion for summary judgment on these claims is granted.

## C. KRS § 292.480(1)

Durham next contends that summary judgment should be granted as to Plaintiffs' K.R.S. §

292.480(1) claim because he does not fall within the class of persons subject to liability under §

292.480(1).[7]  Plaintiffs argue that Durham is liable under § 292.480(1) as one who "offers or sells"

a security.  K.R.S. § 292.480 is to be construed in line with §12 of the Securities Act of 1933.  Booth

_____

[7]  Section 292.480(1) states that "any person, who offers or sells a security in violation of this chapter or of any rules or orders promulgated hereunder or offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made in the light of the circumstances under which they are made not misleading (the buyer not knowing of the untruth or omission) and who does not sustain the burden of proof that he did not know and in the exercise of reasonable care could not have known of the untruth or omission is liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at the legal rate from the date of payment costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Ky. Rev. Stat. Ann. § 292.480(1) (West 2009).

v. Verity, 124 F. Supp. 2d 452, 464 (W.D. Ky. 2000); see also Brantley v. Harris, 2010 WL 2889663, slip op. at *5  (W.D. Ky. July 21, 2010) (noting that § 292.480 parallels the federal securities laws).  In Pinter v. Dahl, the Supreme Court defined the phrase "offer or sell," under § 12, to include not only those who pass title, but also those who solicit an offer or sale. Pinter v. Dahl, 486 U.S. 622, 642, 644 (1988); see also Smith v. Am. Nat'l Bank & Trust Co., 982 F.2d 936, 942 (6th Cir. 1992) (liability only attaches to those who "either passed title or offered to do so, or solicited an offer").  Although the Supreme Court defined "offer or sell" broadly in Pinter, the definition is not so broad so as to include "professionals, such as attorneys or accountants, whose participation is confined to providing professional services."  Riedel v. Acutote of Colorado, 773 F. Supp. 1055, 1062 (S.D. Ohio 1991) (citing  Pinter, 486 U.S. at 647, 651).  This is so "because, quite obviously, buyers commonly do not say that they purchased securities from lawyers or law firms that helped  to prepare promotional material or offering statements."  Mercer v. Jaffe, Snider, Raitt & Heuer, P.C., 713 F. Supp. 1019, 1024 (W.D. Mich. 1989).

Durham argues that he did not solicit an offer or sell the securities in question, and, therefore, cannot be found liable under K.R.S. § 292.480(1).  Plaintiffs contend that Durham's preparation of PPMs replete with material misrepresentations and omissions, his inclusion of a statement that he was available to discuss the offers with prospective investors, and the fact that Heartland had sanctioned this investor availability all suggest that Durham was part of the solicitation and sales process.  The Court, in its Memorandum Opinion and Order, dated March 24, 2009, dismissed Plaintiffs' §12 claim finding that the Consolidated Complaint failed to allege Durham actively participated in the solicitation of the sale of securities.  In that order, the Court stated that preparing PPMs and making oneself available to answer questions from potential investors are actions that are

consistent with the rendering of professional services by an attorney and do not make one an offeror or seller of securities.

Plaintiffs now submit the same evidence to support liability under § 292.480(1) with the additional fact that Durham's invitation to speak with investors was sanctioned by Heartland. Plaintiffs offer no authority to support the proposition that this additional fact places Durham's conduct within the realm of a solicitor and seller of securities. The actions that Plaintiffs contend make Durham a solicitor or seller of securities are merely those of a lawyer rendering professional services. Finding no genuine issue of material fact as to Durham's status as an offeror or seller of securities, Durham's motion for summary judgment on Plaintiffs' K.R.S. § 292.480(1) claim is granted.

### D. KRS § 292.480(4)

Durham also argues that he cannot be held liable under K.R.S. § 292.480(4) because he does not fit the definition of an agent under the statute. K.R.S. § 292.480(4), unlike federal securities laws, has been interpreted in other jurisdictions as imposing aiding and abetting liability on those who materially assist others in violating the state's securities laws. See e.g. Arthur Young & Co. v. Reves, 937 F.2d 1310, 1325 (8th Cir. 1991 ) (interpreting a similar provision under Arkansas law as creating aiding and abetting liability). K.R.S. § 292.480(4) states that "every . . . agent who materially aids in the sale or purchase is also liable jointly and severally with and to the same extent as the seller or purchaser . . . ." The term agent is statutorily defined as "any individual other than a broker-dealer who represents a broker-dealer or issuer in *effecting or attempting to effect purchases or sales of securities*." Ky. Rev. Stat. Ann. § 292.310(1) (West 2009) (emphasis added).

The only Kentucky court to issue an opinion as to liability under § 292.480(4) held that "any

-18-

person who facilitates another person's securities fraud becomes vicariously liable absent an affirmative demonstration of good faith." Senior Healthcare Ins. and Fin. Serv., Inc. v. Clementi, 2007 WL 1784158 (Ky. Ct. App. 2007) (unpublished). Clementi, however, offers no framework to determine when a person has facilitated another person's securities fraud, and the Kentucky Supreme Court has yet to consider this particular issue. Therefore, the Court must predict how Kentucky courts would decide such a case. See Welsh v. United States, 844 F.2d 1239, 1245 (6th Cir. 1988).

Section 292.480 is modeled after § 401 of the Uniform Securities Act of 1956. Many other states have also modeled and/or adopted their securities laws based on the Uniform Securities Act of 1956. Therefore, cases from other jurisdictions that have addressed the issue of agent liability are quite persuasive. In Baker, Watts & Co. v. Miles & Stockbridge, the Maryland Court of Special Appeals examined several other jurisdictions in its discussion of the term agent under the Maryland version of § 292.480(4). 620 A.2d 356, 367-68 (Md. Ct. Spec. App. 1993), *superseded on other grounds by* Md. Rule 2-504. After a thorough discussion of the case law available, the Baker court held that

> [a]lthough the definition of "agent" in the state securities laws . . . may vary to differing degrees from the definition in [Maryland's Blue Sky Act], they each have one thing in common: they do not impose liability upon an attorney who merely provides legal services or prepares documents for his or her client. To impose liability, *the attorney must do something more than act as legal counsel*.

Baker, 620 A.2d at 368 (emphasis added). The court then held that for a lawyer to be considered to have effected or attempted to effect the purchase or sale of securities he or she must have actively assisted in offering securities for sale, solicited offers to buy, or actually performed the sale. Id.; see also Ward v. Bullis, 748 N.W.2d 397, 405 (N.D. 2008) (adopting the Baker test to determine a

lawyer's agency status); <u>Jonhson v. Colip</u>, 658 N.E.2d 575, 578 (Ind. 1995) (agreeing with the approach used in <u>Baker</u>).

In <u>Colip</u>, the Indiana Supreme Court was presented with the question of whether an attorney was an agent under the Indiana Securities Act when he drafted a prospectus intended to solicit investors and then attended certain investor meetings to answer legal questions. In discussing whether attendance at investor meetings and answering investors' legal questions constituted an attempt to effect the sale of securities the court found that the content of the attorney's answers and not simply the act of answering the questions was the key factor in determining if the attorney had attempted to effect the sale of securities. <u>Id.</u> at 578-79. The court found that plaintiffs failed to present evidence regarding the content of any conversations they may have had with the attorney and denied summary judgment for the plaintiffs.

In the present case, Durham is alleged to have done less than the defendant-attorney in <u>Colip</u>. Plaintiffs identify three facts that they claim indicate that Durham acted as an agent in an attempt to effect the sale of the securities. These facts are: (1) that Durham identified himself as the preparer of the PPMs; (2) he included within the PPMs a statement that he was available to answer any questions that the investors may have had; and (3) he was expressly authorized to do this by Heartland Resources. These undisputed facts do not create a genuine issue of material fact regarding Durham's status as an agent under § 292.480(4).

Durham's preparation of the PPMs falls squarely within the category of providing legal services, which does not constitute an attempt to effect the sale of a security. Likewise, Durham's offer to speak with investors fails to demonstrate that he actively assisted in offering securities for sale. A willingness to speak to potential investors, in and of itself, does not illustrate active

assistance where the defendant never in fact speaks to the plaintiffs.[8]  Finally, Plaintiffs' last claim,

that Durham had express authorization from Heartland to speak with investors, in no way

demonstrates active assistance in offering securities for sale, soliciting offers to buy, or actually

performing the sale.  Plaintiffs have produced no evidence of a genuine issue of material fact as to

Durham's status as an agent under § 292.480(4).[9]  Therefore, Durham's motion for summary

judgment on Plaintiffs' K.R.S. § 292.480(4) claim is granted.[10]

### E. Common Law Fraud Claim

Durham contends that Plaintiffs' common law fraud claim fails because they cannot establish

loss causation.  To prevail on a claim of common law fraud, a plaintiff must establish, by clear and

convincing evidence, the following six elements:  (1) that the declarant made a material

misrepresentation to the plaintiff, (2) that this misrepresentation was false, (3) that the declarant

knew it was false or made it recklessly, (4) that the declarant induced the plaintiff to act upon the

---

[8]  To the extent that Plaintiffs discuss the conversations of William R. Siefring and Cassidy Hurst with Durham, those conversations do not create liability under K.R.S. § 292.480(4) because Hurst's conversation occurred after he had already invested with Heartland and because Siefring executed a valid release of his claims against Durham after their conversation.  See infra discussion on Siefring Part III.H.  Even if these conversations made Durham an agent under the statute, which the Court does not believe, they would only apply to Plaintiffs Hurst and Siefring and would not make Durham an agent under 292.480(4) as to all Plaintiffs.

[9]  Plaintiffs argue in the alternative that if Durham does not qualify as an agent under the statutory definition, that the term agent should be interpreted in a different context as was done in Arthur Young & Co. v. Reves, 937 F.2d 1310, 1325-26 (8th Cir. 1991).  The Court finds this argument unpersuasive and unnecessary as an appropriate test under Kentucky law has already been applied.

[10]  The Court has not addressed Durham's liability under K.R.S. §§ 292.320-.340 because civil liability for those violations is predicated on a violation of K.R.S. § 292.480(1) and (4).  Having found that summary judgment for Durham should be granted regarding K.R.S. § 292.480(1) and (4), the Court finds that Durham cannot be liable under K.R.S. §§ 292.320-.340.  See Brantley v. Harris, 2010 WL 2889663, slip op. at *5  (W.D. Ky. July 21, 2010) ("As a technical matter, [KRS 292.320] can only be invoked as the basis of a private cause of action under KRS 292.480 . . . .").

misrepresentation, (5) that the plaintiff relied upon the misrepresentation, and (6) that the misrepresentation caused injury to the plaintiff. Radioshack Corp. v. ComSmart, Inc., 222 S.W.3d 256, 262 (Ky. Ct. App. 2007). Plaintiffs bear the burden of proving reliance and that the reliance was reasonable. Bassett v. Nat'l Collegiate Athletic Ass'n, 428 F. Supp. 2d 675, 682 (E.D. Ky. 2006).

The Kentucky Supreme Court has held in a fraud context that "to be actionable the alleged misrepresentation must not only have induced the recipient's reliance, but must also have caused the recipient's loss." Flegles, Inc. v. Truserv Corp., 289 S.W.3d 544, 553 (Ky. 2009). The court continued on saying "'cause' here of course, means legal or proximate cause, which 'consists of a finding of causation in fact . . . .'"Id.; see also Glaser v. Enzo Biochem, Inc., 464 F.3d 474, 477 (4th Cir. 2006) (affirming dismissal of a common law fraud claim due to insufficient pleading of loss causation); Lincoln Nat. Life Ins. Co. v. Snyder, ---F. Supp. 2d---, 2010 WL 2787453 (D. Del. 2010) (finding loss causation required for common law fraud claim under Deleware state law); Kosovich v. Metro Homes, LLC, 2009 WL 5171737, *6 (S.D.N.Y. 2009) (finding the common law fraud claim deficient for failure to establish loss causation). Plaintiffs' common law fraud claim suffers from the same defect as their § 10(b) and Rule 10b-5 claims, namely that they are unable to prove that the misrepresentation caused injury to the plaintiff. Finding no genuine issue of material fact as to the absence of loss causation, Durham's motion for summary judgment as to the Plaintiffs' common law fraud claim is granted.

### G. Claims Based on Tennessee Law

Durham contends that the named Plaintiffs in his eight separate motions for summary judgment are not residents of Tennessee and that their claims have no relationship to Tennessee law

and should be dismissed as a matter of law.  The named Plaintiffs concede that they have no claims against Durham based upon Tennessee law.  Finding no genuine issue of material fact regarding the claims against Durham based on Tennessee law, Durham's motion for summary judgment is granted as to the named Plaintiffs' claims based on Tennessee law.

## H. William R. Siefring Trust

A separate analysis of the William R. Siefring Trust's § 292.480(4) claim is needed because Siefring did in fact speak with Durham prior to investing with Heartland.  William R. Siefring, as trustee of the William R. Siefring Trust, invested approximately $1,170,000 in various Heartland Resources' oil and gas programs from May 2004 through December 2004.  Prior to his investments with Heartland, Siefring spoke with Durham over the phone regarding Heartland's operation and its executives.  In April 2005, Siefring began complaining to Paul Johnson (a Heartland salesman) and David Stewart about the productivity of his investments.  Eventually, Siefring mentioned that he was considering hiring an attorney to look into the investments he had made with Heartland.  At that point, Heartland Resources told Siefring that they were willing to give him additional interests in oil and gas wells if he would release any claims he may have had against Heartland.  On April 11, 2006, Siefring and Heartland Resources signed a release agreement prepared by James D. Zornes (Durham's law partner at Durham & Zornes).  The release agreement stated in pertinent part:

> For the consideration set forth herein, the Investor [William R. Siefring Trust] hereby forever releases. . . Heartland, its legal representatives, agents, successors, assigns, officers, directors, shareholders, employees, attorneys, and any person or entity acting on Heartland's or their behalf, from any and all losses, damages, liabilities, claims, actions, causes of action, suits, . . . or agreements, of whatever nature or kind, known and unknown, whether based in law or in equity, that the Investor ever had or has now. . ., which were raised or asserted or could have been raised or asserted by the Investor against Heartland at any time prior to the execution of this Release, including but not limited to any and all claims arising out of or in any way related to the Investment.

(Siefring Dep. Exhibit 1 at 1-2.) The consideration for Siefring's release of his potential claims was interests in three wells. Siefring did not discuss this release agreement with Durham or any other lawyer, accountant, or tax advisor prior to signing it. Two years later Siefring sued the Heartland Defendants and Durham claiming numerous violations of securities laws. Durham has moved for summary judgment claiming that the release agreement signed by Siefring, as trustee for the William R. Siefring Trust, was a valid release of the Trust's claims.

Plaintiffs claim that Durham's conversation with Mr. Siefring prior to his investments with Heartland make Durham an agent under K.R.S. § 292.480(4). Durham contends that Mr. Siefring released all of the Trust's claims against Heartland Resources and Hunter Durham, including his § 292.480(4) claim by signing a Release and Settlement Agreement. "An agreement to settle legal claims is essentially a contract subject to the rules of contract interpretation. It is valid if it satisfies the requirements associated with contracts generally, i.e., offer and acceptance, full and complete terms, and consideration." Cantrell Supply, Inc. v. Liberty Mut. Ins. Co., 94 S.W.3d 381, 384 (Ky. App. 2002). "[T]he construction and interpretation of a contract, including questions regarding ambiguity, are questions of law to be decided by the court[.]" Frear v. P.T.A. Indus., Inc., 103 S.W.3d 99, 105 (Ky. 2003) (citation omitted). An additional inquiry must be made in situations such as this one dealing with a release of a federal securities claim.

In Goodman v. Epstein, 582 F.2d 388, 402 (7th Cir. 1978), the Court of Appeals for the Seventh Circuit took up an analysis of the validity of a release of federal securities fraud claims. The court found that "a purported release of claims under the federal securities laws is valid only as to mature, ripened claims of which the releasing party had knowledge before signing the release." However, the dispute the court was asked to address was whether the proper standard was actual

knowledge of claims or knowledge of possible claims the releasing party should have known upon

reasonable inquiry.  Id. at 403.  The court found that the reasonable inquiry standard was the

appropriate test, stating that

> the mere act that an individual has been asked to sign a release should be sufficient
> to put that individual on notice that a reasonable inquiry should be undertaken. No
> longer do we have the innocent investor sitting back and merely holding his security;
> we are not requiring an innocent investor Continually [sic] to question management
> concerning his investment, but only to undertake a "reasonable inquiry" prior to
> taking the affirmative act of signing a release.

Id. at 404.  The court continued on stating that the use of the reasonable inquiry standard "insures

that the signing of a waiver is something that will not be undertaken lightly, with the expectation that

the waiver will be unenforceable even as to existing claims because the party executing the waiver

kept his eyes closed, and therefore did not 'know.'" Id.; see also Moseman v. Van Leer, 263 F.3d
in support and opposition to the eight individual motions for summary judgment were in many
129, 133 (4th Cir. 2001) (adopting the Goodman reasonable inquiry standard).
respects identical.  These individual Plaintiffs are all represented by the same attorneys, and
Durham argues that by executing this agreement, Mr. Siefring effectively released all claims
although the motions were filed against separate parties, they were all filed at the same time, read,
he may have had at the time against Durham including his K.R.S. § 292.480(4) claim.  The release

agreement certainly meets the requirements under Kentucky law for a valid release of legal claims.

There was an offer by Heartland Resources of a release and an acceptance by Siefring, for which

Siefring received interests in three wells as consideration.  All of this was reduced to writing in full

and complete terms and signed by both parties.  It is, therefore, a valid release under Kentucky law.

However, Siefring raises several arguments in response to the release.  He first argues that

the release is not effective because it does not comply with K.R.S. § 292.480(5)(a).[11]  However, that

---

[11]    No person may sue under this section: (a) If the buyer received a written offer, before
suit and at a time when he owned the security, to refund the consideration paid together with interest
at the legal rate from the date of payment, less the amount of any income received on the security,

continue...

section does not prescribe the method to effect a proper release agreement relating to securities fraud. Rather, that section prohibits plaintiffs from filing suit under the Kentucky Blue Sky Laws if they have successfully negotiated an agreement for rescission. It is not, as Plaintiff Siefring contends, "[t]he statutory procedure for the settlement or release of all claims arising under Section 292.480(1)."

Siefring next argues that the release agreement is ineffective because violations of the securities law may only be released or waived when (1) the claims are mature and based on past violations of the securities law and (2) the releasing party has actual or constructive knowledge of the claims. Siefring continues on claiming he did not have knowledge of Heartland Resources' securities violations or the existence of any claims he may have had against Heartland when he signed the release agreement. However, Siefring never undertook a reasonable inquiry into any possible claims he may have had against Heartland Resources. Siefring threatened to retain a lawyer to look into his investment with Heartland, and in response, Heartland offered him the release agreement and interests in three additional wells. Such an action by Heartland should have put Siefring on notice that there were possible claims to be made against Heartland. Speaking with a lawyer and conducting a reasonable inquiry would have produced sufficient evidence of possible securities fraud claims against Heartland. Therefore, although Siefring did not attempt to conduct a reasonable inquiry, he is deemed to have had constructive knowledge such that the release was valid as to any claim Siefring had prior to April 11, 2006.

---

[11] ...continue

and he failed to accept the offer within thirty (30) days of its receipt. Ky. Rev. Stat. Ann. § 292.480(5)(a) (West 2009).

Siefring next contends that even if the release is deemed to be valid that it constitutes a separate sale of a security, for which Durham may be liable. Siefring argues that Heartland's disposition of the wells in return for the signed release qualifies as the sale of a security under both federal and Kentucky law and that Durham misrepresented or failed to disclose certain facts necessary under federal and Kentucky securities laws. However, although Durham was Heartland Resources' securities lawyer at the time the release agreement was executed, Durham was not the preparer of the document. The last page of the release agreement states clearly that "the foregoing instrument was prepared on behalf of Heartland Resources, Inc., by James D. Zornes." (Siefring Dep. Exhibit 1.) To the extent the release agreement omitted material representations, Siefring has failed to demonstrate how those omissions are in any way attributable to Durham. The release agreement signed by Plaintiff Siefring was valid and did release Durham from all of Siefring's claims including his K.R.S. § 292.480(4) claim.

Due to the disposition of all of the named Plaintiffs' claims, the Court need not address any of the remaining arguments and, therefore, issues no opinion as to their validity.

## IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that the motion by Hunter Durham for summary judgment against all Plaintiffs based on an election of remedies theory [DN 258] is **DENIED.**

**IT IS FURTHER ORDERED** that the motion by Hunter Durham for oral argument [DN 245] is **DENIED**.

**FURTHER** that the motion by Hunter Durham for summary judgment against George Wolff and GDWP LLC [DN 240] is **GRANTED**.

**FURTHER** that the motion by Hunter Durham for summary judgment against Peter and Nancy Keim [DN 243]is **GRANTED**.

**FURTHER** that the motion by Hunter Durham for summary judgment against William R. Siefring Trust [DN 244] is **GRANTED**.

**FURTHER** that the motion by Hunter Durham for summary judgment against B.L. Lanier & Associates, B.L. Lanier Fruit Company, Sara T. Lanier Irrevocable Trust and Bobby Lanier [DN 247] is **GRANTED**.

**FURTHER** that the motion by Hunter Durham for summary judgment against Thomas G. Marks Living Trust Date January 13, 1986 [DN 248] is **GRANTED**.

**FURTHER** that the motion by Hunter Durham for summary judgment against Ken and Anita Brown [DN 249] is **GRANTED**.

**FURTHER** that the motion by Hunter Durham for summary judgment against Dan and Martha Boyd and Able Fence Company Profit Sharing Plan [DN 252]  is **GRANTED**.

**FURTHER** that the motion by Hunter Durham for summary judgment against Cassidy Hurst and Millennium Realty LLC [DN 253] is **GRANTED**.

cc: counsel of record