# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### BOWLING GREEN DIVISION

CIVIL ACTION NO. 1:08CV-94-JHM

FREDERICK P. CLAYTON, JR., et al.                    PLAINTIFFS

V.

HEARTLAND RESOURCES, INC., et al.                    DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on a motion by Plaintiffs for partial summary judgment against Defendant, Hunter Durham, on Plaintiffs' § 10(b) and Rule 10b-5 claims, Kentucky Blue Sky Law claims, Tennessee Consumer Protection Act claims, and common law fraud claims [DN 269].  In connection with this motion for summary judgment, Plaintiffs filed a motion to exceed the page limit on their memorandum [DN 266] and their reply [DN 399], and Defendant filed a motion to exceed the page limit on his response [DN 266].  The Parties also filed a joint motion requesting oral arguments [DN 287].  Having been fully briefed, these matters are ripe for decision.

## I. STANDARD OF REVIEW

In order to grant a motion for summary judgment, the Court must find that the pleadings, together with the depositions, interrogatories and affidavits, establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record which demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Once the moving party satisfies this

burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to do more than simply show there is some "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The Rule requires the non-moving party to present "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252. It is against this standard that the Court reviews the following facts.

## II. BACKGROUND

Heartland Resources, Inc. (Heartland) is a Kentucky corporation that was formed in 2002 by David Stewart and Mark Haynes. Heartland is an oil and gas exploration company that issued working interests and partnership interests in a number of offerings sold to the Plaintiffs. Hunter Durham is an experienced securities lawyer of forty-four years, who represented and advised Heartland Resources in the issuance of these securities. Durham's services for Heartland included drafting and reviewing private placement memorandums (PPMs) as well as making himself available to speak with prospective investors, should they have any questions. In this role, Durham drafted and/or reviewed approximately twenty PPMs over a five year period and spoke to at least two investors on the telephone.

Many of the Plaintiffs received these PPMs, although not all investors received a PPM, after being solicited by Heartland. Heartland engaged in a general solicitation process which involved

salesmen placing hundreds of unsolicited calls each day. Heartland salesmen also attended at least two investor conferences in search of potential investors. These salesmen were paid a modest salary but were able to receive bonuses based on a profit-sharing plan that compensated the salesmen for revenue generated from the sale of securities to investors. To qualify for the plan, a salesman had to reach certain bench marks that included the number of calls placed, the number of PPMs sent to investors, the number of new clients retained, and the amount of money raised for general or limited partnership activities.

Heartland itself was not a registered securities broker-dealer in the state of Kentucky, which was a violation of Kentucky securities law, and a fact known by Durham. The securities that Heartland was issuing were not registered with the Securities and Exchange Commission or the Kentucky Division of Securities, another fact known by Durham. The consequence of the general solicitation process, the salesmen's remuneration, and the violation of Kentucky securities law was that the securities themselves were neither registered nor eligible for an exemption under either federal or Kentucky law. Therefore, each investor had a right to rescission of his or her investment in Heartland and its issuer partnerships. The PPMs, however, never revealed that the interests being sold were not exempt and were subject to a claim of rescission. In fact, the PPMs specifically stated that the securities being sold *were* exempted under federal and Kentucky law.

This misrepresentation along with five other misrepresentations and omissions found or not found in the PPMs comprise the basis for the present suit against Durham.[1] Specifically, Plaintiffs

---

[1] In their brief, Plaintiffs allege that there are eight material misrepresentations and omissions. However, Durham has argued, and this Court agrees, that the omissions regarding the type of solicitation Heartland used to acquire investors, that Heartland salesmen were paid remuneration, that Heartland was not a registered broker-dealer, and consequently that investors

continue...

allege that the PPMs: 1) failed to disclose that in 1998 David Stewart and Mark Haynes, as well as every entity directly and indirectly controlled by them, were prohibited from selling unregistered securities in the state of Wisconsin; 2) misrepresented that in December 2002 an administrative action was filed against Homeland Energy of Kentucky, Inc. (Homeland Energy) by the Kentucky Division of Securities charging fraud and misrepresentation;[2] 3) misrepresented that a 2006 cease and desist order issued by the Alabama Securities Division was "temporary"; 4) failed to disclose that in 2006 David Stewart was indicted and pled guilty to federal income tax evasion; 5) misrepresented that the personal assets of investors would not be subject to claims of creditors of the issuing partnership that were formed as general partnerships; and 6) that the securities were exempt from registration under both federal and Kentucky securities laws.

In February, 2008, counsel for Plaintiffs sent a letter to Durham, as attorney for Heartland, seeking monies paid to Heartland for the completion of twenty-four (24) wells in Knox County, Kentucky, which were never completed or equipped by Heartland. This lawsuit followed. On February 1, 2010, this Court granted the Plaintiffs' motion for partial summary judgment against Heartland and all other defendants, except Durham, on eight counts and found that the Plaintiffs were entitled to rescission of their subscription agreements with Heartland.

### III. Discussion

---

[1] ...continue
would have a right to rescission of their investments are actually a product of the misrepresentation that the securities were exempt under federal and state law. Therefore, the court will address these omissions as the single misrepresentation found in the PPMs that the securities were exempt under federal and state law.

[2] David Stewart was the owner and chief executive officer of Homeland Energy and Mark Haynes was the company's executive vice-president at the time the charges of fraud and misrepresentation were alleged to have occurred.

Plaintiffs concede that those Plaintiffs who invested in the Crescent Thunder #1, #2, and #3 and in the Oklahoma State #1, #2 and #3 drilling programs have no claims against Durham. The remaining Plaintiffs have moved for summary judgment on four substantive theories as to Durham's liability: 1) violation of the Exchange Act; 2) violation of the Kentucky Blue Sky Laws; 3) violation of the Tennessee Consumer Protection Act; and 4) common law fraud. These four theories will be discussed in turn.

## A. Violation of the Exchange Act

In their first cause of action, Plaintiffs allege that Durham violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b. In relevant part, § 10(b) provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (2010). Rule 10b-5, the SEC regulation promulgated under § 10(b), provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (2010). The basic elements of a cause of action under these anti-fraud provisions are (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the

purchase or sale of a security; (4) reliance (or transaction causation); (5) economic loss; and (6) loss causation. Brown v. Earthboard Sports USA, Inc., 481 F.3d 901, 917 (6th Cir. 2007) (citing Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005)). Durham contests each of these elements, but his strongest arguments are directed at the reliance and loss causation elements. Finding the analysis of these two elements to be dispositive of this claim, reliance and loss causation will be the only two elements discussed.

## *I. Reliance*

To recover under § 10(b) or Rule 10b-5, a plaintiff must establish reliance upon the defendant's deceptive act. Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 159 (2008). "To prove reliance, [a] plaintiff must prove that the misrepresentation actually and reasonably induced him to act differently than he otherwise would have if the truthful fact had been disclosed and that by an objective standard such reliance was justified under all the circumstances." Platsis v. E.F. Hutton Co. Inc., 642 F. Supp. 1277, 1299 (W.D. Mich. 1986). When a plaintiff alleges fraud based on omissions, the Supreme Court has held that reliance is presumed. Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153-54 (1972); see also Molecular Technology Corporation, 925 F.2d 910, 918 (6th Cir. 1991). This presumption arises because requiring a plaintiff to show a speculative state of facts, how he would have behaved had he known the omitted facts, places an unrealistic evidentiary burden on the plaintiff. Joseph v. Wiles, 223 F.3d 1156, 1162 (10th Cir. 2000) (citing Affiliated Ute, 406 U.S. at 153-54). However, when the plaintiff alleges affirmative misrepresentations he is not entitled to such a presumption and must prove reliance. Id. When plaintiffs allege both affirmative misrepresentations and omissions the court must engage in a context-specific determination of whether the offenses alleged are characterized as omissions or

affirmative representations, in order to determine a unitary burden of proof on the reliance issue. Id.; see also Binder v. Gillespie, 184 F.3d 1059, 1064 (9th Cir. 1999) (holding that the Affiliated Ute presumption should not be applied to cases that allege both omissions and affirmative misrepresentations unless the allegation can be characterized as an omission); Cox v. Collins, 7 F.3d 394, 395 (4th Cir. 1993) (holding that the Affiliated Ute presumption of reliance is not warranted in a Rule 10b-5 case when the plaintiff alleges both non-disclosure and affirmative misrepresentations).[3]

In Joseph, the court examined the plaintiff's claims to determine if they should be characterized as omissions or affirmative misrepresentations. The plaintiff's complaint contained claims "pled in such a manner as to intertwine affirmative acts with omissions in a strained attempt to recharacterize the alleged wrongdoing" as omissions. Joseph, 223 F.3d at 1163. The court listed the following examples from the plaintiff's complaint:

> [Defendants] consistently *omitted to disclose that its financial statements had been falsified* and that its sales, revenues, assets and shareholders' equity had been artificially inflated. *Defendants concealed the existence of the unlawful scheme and the acts of manipulation committed pursuant thereto.* In furtherance of this campaign of concealment, [defendants] continually reported in its public statements that it had achieved, and would continue to achieve, substantial growth in revenue and profits. *These statements . . . were materially false and misleading in that they failed to disclose the existence of the fraudulent scheme . . . .*

Id. (emphasis in original). The court concluded that the claims "while struggling valiantly to bring the alleged conduct within the definition of 'omission,'" were indicators of affirmative misrepresentations and that the plaintiff was not entitled to a presumption of reliance. Id.

---

[3] To the extent that Plaintiffs claim Molecular controls in this case, the Court disagrees. Molecular is distinguishable from the present case on the basis that defendants in Molecular were only alleged to have failed to disclose omissions. Molecular does not control in a case of mixed misrepresentations and omissions.

The present case is similar to Joseph, Plaintiffs have tried to characterize the allegations as mainly omissions. Plaintiffs allege both misrepresentations and omissions, but claim that the "omissions are more numerous and bear substantially more gravity than do [Durham's] misrepresentations." (Pls. Reply 16-17.) The alleged omissions are: 1) the failure to disclose the Wisconsin prohibition; 2) David Stewart's indictment and guilty plea; 3) that Heartland was an unregistered broker-dealer in violation of Kentucky law, was engaged in general solicitation of investors, and was using remuneration to pay salesmen; and 4) that because Heartland securities were not exempt under Rule 506 they were subject to rescission. As hard as Plaintiffs might try to cast these allegations as omissions, only the Wisconsin prohibition should be characterized as an omission. The remaining alleged omissions are actually misrepresentations because information regarding them was found in the PPMs, albeit in varying degrees of truth.

David Stewart's indictment and guilty plea should be characterized as a misrepresentation. After Stewart's conviction, the PPMs stated that David Stewart had stepped down as CEO of Heartland for personal reasons. In their brief, Plaintiffs even argue that the PPMs "prepared and reviewed by Mr. Durham . . . contained a material misrepresentation regarding why David Stewart was no longer CEO of Heartland Resources." (Pls. Mot. Partial Summ. J. 17.) The remaining alleged omissions are actually the product of one material misrepresentation; that the securities sold were exempt from registration under Rule 506.[4] The implication regarding the misrepresentation

---

[4] In their Reply, Plaintiffs produce a chart of the alleged misrepresentations and omissions made by Durham. The chart is broken down into the actual representations made in the PPMs and what the correct representation should have been. In that chart, Plaintiffs identify only two omissions; the Wisconsin prohibition and Heartland's status as an unregistered broker-dealer. Rather than list the other allegations as omissions, Plaintiffs list the ineligibility of the securities to qualify for exemption, the use of general solicitation, the payment of remuneration, and the

continue...

that the securities were exempt was that Heartland was abiding by applicable securities laws and was not engaged in general solicitation, or the payment of remuneration nor were its investments subject to rescission. Accordingly, this Court will treat Heartland's broker-dealer status, general solicitation, remuneration payments, and rescission issue as part of the misrepresentation that the securities were exempt from registration.

Because the allegations should be characterized primarily as misrepresentations, the Plaintiffs are not entitled to a presumption of reliance. Plaintiffs have failed to produce any evidence that they relied on the material misrepresentations, choosing only to argue that they are entitled to a presumption of reliance. Durham, on the other hand, has produced evidence that establishes the existence of a genuine issue of material fact as to reliance. Durham has identified twenty-nine (29) plaintiffs who testified that they did not read the PPM before investing; twenty-four (24) plaintiffs who testified that they did not read the PPM closely before investing; and twenty (20) plaintiffs who never even received a PPM. (Durham Response 3-5.) This more than demonstrates the existence of a genuine issue of material fact regarding which Plaintiffs, if any, actually relied on the misrepresentations contained in the PPMs.

### ii. Loss Causation

In a securities action, the plaintiff bears the burden of proving loss causation. 15 U.S.C. § 78u-4(b)(4). "Loss causation requires 'a causal connection between the material misrepresentation and the loss.'" Brown v. Earthboard Sports USA, Inc., 481 F.3d 901, 920 (6th Cir. 2007) (quoting

---

[4] ...continue
possibility of investor rescission as results of the affirmative misrepresentation that the securities were exempt from registration. This chart reveals the true nature of Plaintiffs' claims as mainly misrepresentations.

Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 342 (2005)). "Traditional tests of proximate cause derived from tort principles are very much germane." Arthur Young & Co. v. Reves, 937 F.2d 1310, 1332 (8th Cir. 1991).

The Court of Appeals for the Fifth Circuit has offered a concise statement of what is required to show that a misrepresentation or omission proximately caused an economic loss:

> The plaintiff must prove . . . that the untruth was in some reasonably direct, or proximate, way responsible for his loss. The [loss] causation requirement is satisfied in a Rule 10b-5 case only if the misrepresentation touches upon the reasons for the investment's decline in value. If the investment decision is *induced by misstatements or omissions that are material* and that were relied on by the claimant, *but are not the proximate reason for his pecuniary loss, recovery under the Rule is not permitted.*

Huddleston v. Herman & MacLean, 640 F.2d 534, 549 (5th Cir. 1981), *aff'd in part and rev'd in part on other grounds*, 459 U.S. 375 (1983) (emphasis added). See also Berckeley Inv. Group, LTD v. Colkitt, 455 F.3d 195, 222 (3d Cir. 2006) ("[T]he loss causation element requires the plaintiff to prove 'that it was the very facts about which the defendant lied which caused its injuries.'") (quoting Caremark, Inc. v. Coram Healthcare Corp., 113 F.3d 645, 648 (7th Cir. 1997)).

In Bastian v. Petren Res. Corp., 892 F.2d 680 (7th Cir. 1990), plaintiffs invested $600,000 in oil and gas limited partnerships. However, the wells failed to produce enough oil to be commercially viable due to the unexpected drop in oil prices after 1981. The plaintiffs claimed that they were fraudulently induced to invest based on material misrepresentations regarding the defendants' competency and integrity. The Bastian plaintiffs claimed they did not know why their investments had failed, but that it did not matter because the defendants employed fraud to induce the investment. They argued that had they known the truth, they would not have invested in the defendants' venture. The Court of Appeals for the Seventh Circuit held that the plaintiffs had failed

to show loss causation. The court noted that "[t]hey have alleged the cause of their entering into the transaction in which they lost money but not the cause of the transaction's turning out to be a losing one." Id. at 684.

In the present case, Plaintiffs contend that the fraudulent misrepresentations induced them to invest in Heartland. They claim that the misrepresentations were so numerous and serious that the entire story of Heartland represented in the PPMs is a fiction. While these claims demonstrate "the cause of their entering into the transaction" they do not demonstrate the "cause of the transaction's turning out to be a losing one." Id. Plaintiffs' sole argument for loss causation centers on the misrepresentation that the securities qualified for an exemption from registration. Plaintiffs argue that the securities were actually not exempt and were subject to rescission and that a successful claim for rescission would cause the business to fail due to liquidity problems and investors would lose their investments. Plaintiffs contend that with this Court's granting of their motion for partial summary judgment against Heartland that such a "possibility has now come to fruition, and [that] the Plaintiffs have obtained a judgment of approximately $18,000,000, an amount which likely exceeds the value of the assets of all of Heartland resources and the Issuer Partnerships." (Pls. Mot. Partial Summ. J. 35.) Plaintiffs seem to be arguing that by seeking and being granted rescission against Heartland, they have suffered a loss because the judgment caused Heartland to become too illiquid to operate.

However, Plaintiffs cannot say that their successful claim for rescission caused Heartland to become too illiquid to operate. The record clearly reflects that in May 2009 Heartland Resources filed a petition for Chapter 11 Bankruptcy, and in November 2009, the Court appointed a receiver to manage the oil and gas wells that the Heartland Defendants had previously owned. It was not

until February 2010 that the Plaintiffs were actually granted rescission against the Heartland Defendants. It is clear that the Heartland Defendants' business was too illiquid to operate and was destroyed well before a successful claim for rescission was ever granted to Plaintiffs. To claim that such a grant of rescission caused their loss is not supported by the record whatsoever.

Plaintiffs have not shown that their successful claim of rescission caused Heartland Resources to fail such that their investment was lost. The evidence in the record demonstrates that Heartland Resources had already failed and declared Chapter 11 Bankruptcy prior to Plaintiffs' successful claim of rescission. Nor have Plaintiffs demonstrated that any other misrepresentation caused Heartland Resources to fail.[5] Because Plaintiffs have failed to demonstrate that the securities' exemption status (the misrepresentation upon which Plaintiffs claim to have relied) led to Heartland's liquidity and bankruptcy problems, and therefore the loss of Plaintiffs' investments (the injury of which Plaintiffs now complain), summary judgment on this claim in favor of Plaintiffs is denied.

### iii. Violations of Rule 10b-5(a) and (c)

Plaintiffs also allege that Durham's actions were violations of Rule 10b-5(a) and (c). "[A] defendant 'not liable under Rule 10b-5(b) for failure to disclose . . . may still be held liable under Rule 10b-5(a) and 10b-5(c) as a participant in [an] allegedly fraudulent scheme.'" Benzon v. Morgan Stanley Distribs., Inc., 420 F.3d 598, 610 (6th Cir. 2005) (quoting Scholnick v. Schecter, 752 F. Supp. 1317, 1323 (E.D. Mich. 1990)). While claims under these subsections of Rule 10b-5

---

[5] Plaintiffs' argue that their judgment against Heartland makes them creditors of the non-plaintiff investors who invested in Heartland General Partnerships. Plaintiffs claim this demonstrates loss causation. However being a creditor of a non-party does not demonstrate suffering an economic loss.

do not require an alleged misstatement or omission, they still require the other elements of a Rule 10b-5 claim to be shown. Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153 (1972) (stating that Rule 10b-5(a) and (c) do not require a misstatement or omission); *In re* Merrill Lynch Investment Mgmt. Funds Secs. Litig., 434 F. Supp. 2d 233, 237 (S.D.N.Y. 2006) (finding that Plaintiffs with Rule 10b-5(a) and (c) claims must still prove the requisite Rule 10b-5 elements).

Accordingly, Plaintiffs 10b-5(a) and (c) claims fail for the same reason that their 10b-5(b) claim failed. Plaintiffs must show reliance and loss causation. Genuine issues of material fact still exist regarding the reliance and loss causation elements, therefore, summary judgment on these claims in favor of Plaintiffs is denied. See *supra* Part III.A.i-ii for a discussion of reliance and loss causation.

## B. Violation of Kentucky Blue Sky Laws

In their sixth, seventh, eighth, ninth and tenth causes of action, Plaintiffs allege that Durham violated various provisions of the Kentucky Blue Sky Laws.

### ii. KRS § 292.480(1)

Plaintiffs next contend that Durham is liable under K.R.S. § 292.480(1)[6] as one who "offers or sells" a security. Section 292.480 is to be construed in line with §12 of the Securities Act of

---

[6] Section 292.480(1) states that "any person, who *offers or sells* a security in violation of this chapter or of any rules or orders promulgated hereunder or offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made in the light of the circumstances under which they are made not misleading (the buyer not knowing of the untruth or omission) and who does not sustain the burden of proof that he did not know and in the exercise of reasonable care could not have known of the untruth or omission is liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at the legal rate from the date of payment costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Ky. Rev. Stat. Ann. § 292.480(1) (West 2009) (emphasis added).

1933. <u>Booth v. Verity</u>, 124 F. Supp. 2d 452, 464 (W.D. Ky. 2000); <u>see also</u> <u>Brantley v. Harris</u>, 2010 WL 2889663, slip op. at *5 (W.D. Ky. July 21, 2010) (noting that § 292.480 parallels the federal securities laws). In <u>Pinter v. Dahl</u>, the Supreme Court defined the phrase "offer or sell," under § 12, to include not only those who pass title, but also those who solicit an offer or sale. <u>Pinter v. Dahl</u>, 486 U.S. 622, 642, 644 (1988); <u>see also</u> <u>Smith v. Am. Nat'l Bank & Trust Co.</u>, 982 F.2d 936, 942 (6th Cir. 1992) (liability only attaches to those who "either passed title or offered to do so, or solicited an offer.") Although the Supreme Court defined "offer or sell" broadly in <u>Pinter</u>, the definition is not so broad so as to include "professionals, such as attorneys or accountants, whose participation is confined to providing professional services." <u>Riedel v. Acutote of Colorado</u>, 773 F. Supp. 1055, 1062 (S.D. Ohio 1991) (citing <u>Pinter</u>, 486 U.S. at 647, 651). This is so "because, quite obviously, buyers commonly do not say that they purchased securities from lawyers or law firms that helped to prepare promotional material or offering statements." <u>Mercer v. Jaffe, Snider, Raitt & Heuer, P.C.</u>, 713 F. Supp. 1019, 1024 (W.D. Mich. 1989).

Plaintiffs contend that Durham's preparation of PPMs replete with material misrepresentations and omissions, his inclusion of a statement that he was available to discuss the offers with prospective investors, and his actions in actually speaking to two investors on the telephone all suggest that Durham was part of the solicitation and sales process.[7] The Court, in its Memorandum Opinion and Order, dated March 24, 2009, dismissed Plaintiffs' §12 claim finding that the Consolidated Complaint failed to allege Durham actively participated in the solicitation of

---

[7] Plaintiffs argue in their Reply Brief that Heartland's salesmen routinely used Durham's name and status as an attorney to reassure and convince wary investors that Heartland was abiding by all applicable laws. Plaintiffs provide no evidence to suggest that Durham knew of this tactic or that he approved of such a tactic. This claim does not support the proposition that Durham, himself, was part of the solicitation and sales process.

the sale of securities. In that order, the Court stated that preparing PPMs and making oneself available to answer questions from potential investors are actions that are consistent with the rendering of professional services by an attorney.

Plaintiffs now submit the same evidence to support liability under § 292.480(1) with the additional fact that Durham did in fact speak to two investors on the telephone. However, one of these two conversations occurred after the investor had already invested with Heartland, and, therefore, cannot be said to have been a solicitation or sale. (Hurst Dep. 41:5-18, 49:22-50:2.) Furthermore, Plaintiffs offer no case law to support the proposition that this additional fact places Durham's conduct within the realm of a solicitor and seller of securities. The Court is unpersuaded that speaking with one potential investor transforms the rendering of professional services into solicitation and sales of securities. Plaintiffs have failed to show the absence of a genuine issue of material fact as to Durham's active participation in the solicitation of the sale of the securities, therefore, summary judgment on this claim in favor of Plaintiffs is denied.

### iii. KRS § 292.480(4)

Plaintiffs also claim that Durham is liable under K.R.S. § 292.480(4) which, unlike federal securities laws, has been interpreted in other jurisdictions as imposing aiding and abetting liability on those who materially assist others in violating the state's securities laws. See e.g. Arthur Young & Co. v. Reves, 937 F.2d 1310, 1325 (8th Cir. 1991 ) (interpreting a similar provision under Arkansas law as creating "two types of secondary liability for securities fraud, control person liability and aiding and abetting liability.") (citation omitted). K.R.S. § 292.480(4) states that "every . . . agent who materially aids in the sale or purchase is also liable jointly and severally with and to the same extent as the seller or purchaser . . . ." Ky. Rev. Stat. Ann. § 292.480(4) (West 2009). The

term agent is statutorily defined as "any individual other than a broker-dealer who represents a broker-dealer or issuer in effecting or attempting to effect purchases or sales of securities." Ky. Rev. Stat. Ann. § 292.310(1) (West 2009).

The only Kentucky court to issue an opinion as to liability under K.R.S. § 292.480(4) held that "any person who facilitates another person's securities fraud becomes vicariously liable absent an affirmative demonstration of good faith." Senior Healthcare Ins. and Fin. Serv., Inc. v. Clementi, 2007 WL 1784158 (Ky. Ct. App. 2007) (unpublished). Clementi, however, offers no framework to determine when a person has facilitated another persons securities fraud, and the Kentucky Supreme Court has yet to consider this particular issue. Therefore, the Court must predict how Kentucky courts would decide such a case. See Welsh v. United States, 844 F.2d 1239, 1245 (6th Cir. 1988) ("[O]ur task [in a diversity case] is to make our best prediction, even in the absence of direct state court precedent, of what the Kentucky Supreme Court would do if it were confronted with this question.").

Section 292.480 is modeled after § 401 of the Uniform Securities Act of 1956. Many other states have also modeled and/or adopted their securities laws based on the Uniform Securities Act of 1956. Therefore, cases from other jurisdictions that have addressed the issue of agent liability are quite persuasive. In Baker, Watts & Co. v. Miles & Stockbridge, the Maryland Court of Special Appeals examined several other jurisdictions in its discussion of the term agent under the Maryland version of § 292.480(4). 620 A.2d 356, 367-68 (Md. Ct. Spec. App. 1993), *superseded on other grounds by* Md. Rule 2-504. After a thorough discussion of the case law available, the Baker court held that

> Although the definition of "agent" in the state securities laws . . . may vary to
> differing degrees from the definition in [Maryland's Blue Sky Act], they each have

one thing in common: they do not impose liability upon an attorney who merely provides legal services or prepares documents for his or her client. To impose liability, the attorney must do something more than act as legal counsel.

Baker, 620 A.2d at 368. The court then held that for a lawyer to be considered to have effected or attempted to effect the purchase or sale of securities he or she must have actively assisted in offering securities for sale, solicited offers to buy, or actually performed the sale. Id.; see also Ward v. Bullis, 748 N.W.2d 397, 405 (N.D. 2008) (adopting the Baker test to determine a lawyer's agency status); Jonhson v. Colip, 658 N.E.2d 575, 578 (Ind. 1995) (agreeing with the approach used in Baker).

In Colip, the Indiana Supreme Court examined a motion for summary judgment filed by plaintiff-investors against a defendant-lawyer. The court was presented with the question of whether an attorney was an agent under the Indiana Securities Act when he drafted a prospectus intended to solicit investors and then attended certain investor meetings to answer legal questions. In discussing whether attendance at investor meetings and answering investors' legal questions constituted an attempt to effect the sale of securities the court found that the content of the attorney's answers and not simply the act of answering the questions was the key factor in determining if the attorney had attempted to effect the sale of securities. The court explained:

> if when called upon at the meetings, [the attorney] primarily reassured investors that risks about which they expressed concern were unlikely to materialize, such behavior made it more likely than not that the investors would purchase the securities and constituted an attempt to effect a purchase or sale. On the other hand, if [the attorney's] principal function at the meeting was to either temper the exuberance of the principal promoters . . . or to discuss the technical aspects of the partnership agreement or its tax consequences with counsel for prospective investors (much as would occur in the negotiations in any reasonably sophisticated business transaction), we think these facts are not susceptible to the inference that an attempt to effect the purchase or sale of a security occurred.

Id. at 578-79.  The court found that summary judgment for plaintiffs was not appropriate.  The court went even further saying in a footnote that to the extent that there was undisputed evidence that the attorney did not attend certain partnership investment meetings "it would appear to us that summary judgment for [the attorney] in respect of those partnerships would be appropriate."  Id. at 579 n.6.

In the present case, Plaintiffs contend that Durham acted as an agent in an attempt to effect the sale of the securities by preparing the PPMs, including within the PPMs a statement that he was available to answer any questions that the investors may have had, and by actually talking to two investors on the telephone.  Given only these undisputed facts, summary judgment on this matter is not appropriate.  Durham's preparation of the PPMs falls squarely within the category of providing legal services, which does not constitute an attempt to effect the sale of a security.  Likewise, Durham's offer to speak with investors fails to demonstrate that he actively assisted in offering securities for sale.  Durham routinely made himself available to talk to the potential investors of all of his clients, a fact acknowledged by Plaintiffs, which reinforces the proposition that such activity falls within the realm of providing legal services.  (Pls. M. Partial Summ. J. 48.)

The fact that these conversations occurred is not dispositive of the issue.  In order to show that Durham attempted to effect the sale of Heartland's securities, Plaintiffs must produce evidence of the content of the specific conversations that Durham had with investors.  Plaintiffs have brought to the court's attention only two investors, William R. Siefring and Cassidy Hurst, who spoke with Durham.  (Pls. Reply 7 n.3.)  Plaintiff William R. Siefring testified that he does not recall the content of his conversation, only that he felt reassured about investing with Heartland after speaking with Durham.  (Siefring Dep. 32:17-36:6.)  Plaintiff Cassidy Hurst testified that his conversation with Durham did not even take place until approximately ten months after investing in Heartland.  (Hurst

Dep. 41:5-18, 49:22-50:2.)[8] Examining these two conversations in the light most favorable to the defendant a genuine issue of material fact exists as to whether Durham's conversations with these two Plaintiffs constitutes an attempt to effect a sale of a security.[9] Finding a genuine issue of material fact regarding Durham's status as an agent under K.R.S. § 292.480(4), summary judgment on this claim in favor of Plaintiffs is denied.[10]

### C. Tennessee Consumer Protection Act

In their eleventh cause of action, Plaintiffs Frederick Clayton and Kent Monypeny contend that Durham violated the Tennessee Consumer Protection Act (TCPA). The TCPA provides for the recovery of damages by "any person who suffers an ascertainable loss of money . . . as a result of the use or employment by another person of an unfair or deceptive act or practice." Tenn. Code Ann. § 47-18-109(a)(1) (2010). This section only applies to "unfair or deceptive practices that affect trade or commerce, as that term is defined in the statute, *e.g.*, the sale or distribution of goods or

---

[8] Durham offers evidence that 72 of the 77 Plaintiffs deposed at the time of the filing of his Response brief had never spoken to Durham. If there is no contention by the Plaintiffs that he did in fact speak to those 72 Plaintiffs, it would appear to the Court that summary judgment for Durham in respect of those 72 Plaintiffs would be appropriate on this claim.

[9] Plaintiffs argue in the alternative that if Durham does not qualify as an agent under the statutory definition, that the term agent should be interpreted in a different context as was done in Arthur Young & Co. v. Reves, 937 F.2d 1310, 1325-26 (8th Cir. 1991). The court finds this argument unpersuasive and unnecessary as an appropriate test under Kentucky law has already been applied.

[10] The Court has not addressed Durham's liability under K.R.S. §§ 292.320-.340 because civil liability for those violations is predicated on a violation of K.R.S. § 292.480. Having found that summary judgment is not appropriate under K.R.S. § 292.480(1) and (4), the Court finds that summary judgment cannot be appropriate under K.R.S. §§ 292.320-.340. See Brantley v. Harris, 2010 WL 2889663, slip op. at *5 (W.D. Ky. July 21, 2010) ("As a technical matter, [KRS 292.320] can only be invoked as the basis of a private cause of action under KRS 292.480 . . . .").

services." <u>Schmidt v. Nat'l City Corp.</u>, 2008 WL 597687 (E.D. Tenn. 2008) (citing Tenn. Code Ann. § 47-18-103(9)).

In <u>Schmidt</u>, the Eastern District of Tennessee noted that neither the Tennessee Supreme Court nor the Tennessee Court of Appeals had decided whether the practice of law constituted trade or commerce under the TCPA. The <u>Schmidt</u> court looked to how the practice of medicine had been treated under the TCPA for guidance. Finding that the practice of medicine was not considered trade or commerce under the TCPA and other similar state statutes, the court found that "the TCPA does not apply to lawyers practicing law because the practice of law is a profession and does not affect trade or commerce as defined in the TCPA." <u>Schmidt</u>, 2008 WL 597687 at * 3 (citing <u>Constant v. Wyeth</u>, 352 F. Supp. 2d 847, 853 (M.D. Tenn. 2003) (practice of medicine does not affect trade or commerce); <u>Simmons v. Stephenson</u>, 84 S.W.3d 926, 927 (Ky. Ct. App. 2002); <u>Janusauskas v. Fichman</u>, 793 A.2d 1109, 1115 (Conn. App. Ct. 2002)).

Plaintiffs contend that Durham's actions in drafting and or reviewing the PPMs that Plaintiffs Clayton and Monypeny received qualifies as the distribution of services affecting trade or commerce in Tennessee. Durham argues that summary judgment for Plaintiffs is inappropriate because the drafting and reviewing of the PPMs constitutes the practice of law and the TCPA does not cover the actions of lawyers engaged in the practice of law. Finding the drafting of legal documents to be part of the practice of law, and that the practice of law does not affect trade or commerce under the TCPA, summary judgment on this claim in favor of Plaintiffs is denied.

### D. Common Law Fraud

In their fourteenth cause of action, Plaintiffs allege that Durham committed common law fraud. To prevail on such a claim, a plaintiff must establish, by clear and convincing evidence, the

following six elements: (1) that the declarant made a material misrepresentation to the plaintiff, (2) that this misrepresentation was false, (3) that the declarant knew it was false or made it recklessly, (4) that the declarant induced the plaintiff to act upon the misrepresentation, (5) that the plaintiff relied upon the misrepresentation, and (6) that the misrepresentation caused injury to the plaintiff. Radioshack Corp. v. ComSmart, Inc., 222 S.W.3d 256, 262 (Ky. Ct. App. 2007). Plaintiffs bear the burden of proving reliance and that the reliance was reasonable. Bassett v. Nat'l Collegiate Athletic Ass'n, 428 F. Supp. 2d 675, 682 (E.D. Ky. 2006).

Plaintiffs offer very little evidence of their reliance on the misrepresentations. In their brief, Plaintiffs claim that they "relied upon the misrepresentations made and did not have the benefit of the information omitted to make a reasonably informed purchase." (Pls. Mot. P. Summ. J. 52.) Nor have Plaintiffs claimed that reliance is presumed. Because Plaintiffs have failed to demonstrate the absence of a genuine issue of material fact as to the reliance element, Plaintiffs motion for summary judgment on this claim is denied.

## IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that the Plaintiffs' motions to exceed the page limit on their memorandum [DN 266] and on their reply [DN 399] and Defendant's motion to exceed page limit on his response [DN 289] are all **GRANTED.**

**IT IS FURTHER ORDERED** that the motion by Plaintiffs for partial summary judgment [DN 269] is **DENIED**.

**FURTHER** that the joint motion by both parties for oral argument [DN 287] is **DENIED**.

**FURTHER** that all Plaintiffs' claims based on investments in the Crescent Thunder

#1, #2, and #3 and Oklahoma State #1, #2, and #3 are dismissed.

cc: counsel of record